# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Case Number: _____

The Honorable Judge: _____

MUTAZ ALSHARA,

    Plaintiff, Pro Se,

  **versus**

GRINDR INCORPORATED, a Delaware

corporation,

    Defendant.

Case: 2:26−cv−11900
Assigned To : Goldsmith, Mark A.
Referral Judge: Ivy, Curtis, Jr
Assign. Date : 6/8/2026
Description: CMP ALSHARA v
GRINDR INCORPORATED (JP)

## VERIFIED COMPLAINT FOR DAMAGES



1. This is not a case of "you can't fix ugly" (Photographed above is Mutaz Alshara, the innocent victim in all of the face photos that follow including these)









**Plaintiff Mutaz Alshara, an openly gay man and paying subscriber to Defendant Grindr Incorporated's social networking platform, brings this action after Grindr banned his account for using the platform's core messaging function — the very activity for which he paid — while Grindr's own support team had previously acknowledged in writing that an identical prior ban was a mistake caused by Grindr's automated anti-spam system. Grindr's repeated wrongful bans, its pattern of consumer-harmful conduct documented in a $20,000,000 Federal Trade Commission settlement, and its systematic denial of user autonomy to LGBTQ+ individuals on the world's largest gay social networking platform violate the Elliott-Larsen Civil Rights Act, the Michigan Consumer Protection Act, and sound principles of contract law.**

May it please the Court.

*This Complaint is filed pro se and is entitled to liberal construction. Haines v. Kerner, 404 U.S. 519, 520 (1972); Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (pro se pleadings are held to less stringent standards than formal pleadings drafted by lawyers and must be liberally construed).*

## I. INTRODUCTION

Good morning, good afternoon, and good evening.

2.     This is an action for compensatory damages, treble damages, punitive damages, injunctive relief, and equitable relief arising from Defendant Grindr

Incorporated's ("Grindr" or "Defendant") discriminatory, deceptive, and unconscionable conduct toward Plaintiff Mutaz Alshara ("Plaintiff"), an openly gay man and paying subscriber to Grindr's social networking platform.

3.   Grindr describes itself as the world's largest social networking app for gay, bi, trans, and queer people, serving over 13,000,000 monthly active users worldwide. For LGBTQ+ individuals — particularly gay men — Grindr functions not merely as a dating application but as a primary avenue for social connection, community building, and companionship. The platform occupies a dominant, near-monopolistic position in the LGBTQ+ dating and social networking market.

4.   Plaintiff used Grindr's platform for approximately six years. During that time, Plaintiff maintained an authentic profile using his own photographs, engaged exclusively in legitimate communications with other users, and paid for Grindr's premium subscription service, Grindr Xtra. Despite this, Grindr's automated artificial intelligence moderation system repeatedly and wrongfully flagged Plaintiff's account and ultimately banned him — for the act of sending messages on a messaging platform.

5.   Critically, Grindr has already admitted that its automated system wrongfully banned Plaintiff. On January 12, 2025, Grindr's own support representative, identified as "Red," wrote to Plaintiff: "Unfortunately, your profile was automatically flagged and banned by one of our anti-spam systems. We have reviewed your profile and see that this was a mistake, and have therefore lifted

the ban on your profile." (Exhibit 2.) Despite this admission — despite knowing that its AI system produces false positives against legitimate users — Grindr allowed the same defective system to ban Plaintiff again, without correction, without process, and without remedy.

## II. PARTIES

6.    Plaintiff Mutaz Alshara is an adult individual and citizen of the State of Michigan, residing at 7737 Appoline Street, Dearborn, Michigan 48126. Plaintiff is an openly gay man whose sexual orientation is central to the claims alleged herein. Plaintiff's identity as an openly gay man is protected under the United States Constitution as interpreted by *Romer v. Evans*, 517 U.S. 620 (1996); *Lawrence v. Texas*, 539 U.S. 558 (2003); *United States v. Windsor*, 570 U.S. 744 (2013); *Obergefell v. Hodges*, 576 U.S. 644 (2015); and *Bostock v. Clayton County*, 590 U.S. 644 (2020); under the Respect for Marriage Act, Public Law 117-228 (2022); and under the Elliott-Larsen Civil Rights Act as amended by 2023 Public Act 6, Michigan Compiled Laws 37.2102(1).

7.    Defendant Grindr Incorporated is a Delaware corporation with its principal place of business in Los Angeles, California. Grindr is publicly traded on the New York Stock Exchange under the ticker symbol GRND. The New York Stock Exchange is a subsidiary of Intercontinental Exchange, Incorporated (NYSE: ICE), a Fortune 500 company. Grindr is the developer, owner, and operator of the Grindr mobile application and associated web services. Grindr is

not a citizen of the State of Michigan.

### III. JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction pursuant to 28 United States Code Section 1332(a)(1) (diversity of citizenship). Plaintiff is a citizen of the State of Michigan. Defendant is a Delaware corporation with its principal place of business in California. Complete diversity exists. The amount in controversy exceeds $75,000, exclusive of interest and costs.

**8.** This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 United States Code Section 1367(a), as the state law claims form part of the same case or controversy and derive from a common nucleus of operative fact.

**9.** Venue is proper in this District pursuant to 28 United States Code Section 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiff accessed, used, and paid for Grindr's services while located in Wayne County, Michigan. Plaintiff was banned from Grindr while located in this District. Grindr transacts substantial business within this District through its provision of services to Michigan residents.

**10.** Personal jurisdiction over Defendant is proper. Grindr purposefully avails itself of the privilege of conducting business within Michigan by offering its services to Michigan residents, collecting subscription fees from Michigan

residents, and processing the personal data of Michigan residents. *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945); Michigan Compiled Laws 600.715.

### IV. THE LGBTQ+ CONSTITUTIONAL AND STATUTORY FRAMEWORK

**11.** The United States Supreme Court has established an unbroken constitutional arc protecting the dignity, autonomy, and equal citizenship of LGBTQ+ individuals:

**(a)** *Romer v. Evans,* 517 U.S. 620, 631–635 (1996): The Court struck down Colorado's Amendment 2, holding that a law motivated by animus toward a particular class of persons violates the Equal Protection Clause. The Court declared that a State cannot deem a class of persons a stranger to its laws.

**(b)** *Lawrence v. Texas,* 539 U.S. 558, 567–579 (2003): The Court held that the liberty protected by the Due Process Clause encompasses the right of gay persons to conduct their private lives free from State interference.

**(c)** *United States v. Windsor,* 570 U.S. 744, 769–770 (2013): The Court struck down Section 3 of the Defense of Marriage Act, holding that the law's principal purpose was to impose a disadvantage, a separate status, and a stigma upon same-sex couples.

**(d)** *Obergefell v. Hodges,* 576 U.S. 644, 663–665 (2015): The Court held that the fundamental right to marry extends to same-sex couples under both the

Due Process Clause and the Equal Protection Clause.

**(e)** *Bostock v. Clayton County,* 590 U.S. 644, 651–652 (2020): The Court held that discrimination on the basis of sexual orientation is necessarily discrimination because of sex, reasoning that it is impossible to discriminate against a person for being gay without discriminating against that individual based on sex.

12.   Congress has reinforced these constitutional protections through the Respect for Marriage Act, Public Law 117-228 (2022), which codified federal recognition of same-sex and interracial marriages and repealed the Defense of Marriage Act.

13.    Michigan has aligned its statutory framework with these constitutional mandates. The Elliott-Larsen Civil Rights Act, as amended by 2023 Public Act 6, expressly prohibits discrimination on the basis of "sexual orientation," defined as "having an orientation for heterosexuality, homosexuality, or bisexuality or having a history of such an orientation or being identified with such an orientation." Michigan Compiled Laws 37.2102(1). The amendment applies to all articles of the Elliott-Larsen Civil Rights Act, including Article 3's prohibition on discrimination in places of public accommodation. Michigan Compiled Laws 37.2302(a). *See also Rouch World, LLC v. Department of Civil Rights,* 510 Mich. 398 (2022) (holding that the Elliott-Larsen Civil Rights Act prohibits sexual orientation discrimination).

### V. FACTUAL ALLEGATIONS

### A. *Plaintiff's Use of the Grindr Platform*

14. Plaintiff has used Grindr's social networking platform for approximately six years, beginning in or around 2020. Throughout that period, Plaintiff maintained a genuine, authentic profile using his own photographs. (See photographs reproduced above.)

15. Plaintiff subscribed to Grindr Xtra, Grindr's premium paid subscription service, for a period of less than one year. The Grindr Xtra subscription provided Plaintiff with enhanced features including additional profile views, advanced filtering options, and other premium functionality. Plaintiff paid regular subscription fees for this service.

16. Plaintiff used the Grindr platform for its intended and advertised purpose: to send and receive messages with other users, to view profiles, and to connect with other gay men for social interaction, friendship, and companionship. Plaintiff's use of the platform was at all times consistent with the platform's stated purpose and Community Guidelines.

16a. Grindr has systematically degraded the user experience for both free and paying users through a series of extractive design changes. Grindr imposes a mandatory 30-second forced video advertisement before users can view other users' profiles, compelling users to watch advertising content as a precondition to using the platform's basic function. This forced-view mechanism inflates Grindr's advertising engagement metrics for its corporate advertisers — including

Intercontinental Exchange, Incorporated, the parent company of the New York Stock Exchange where Grindr itself is listed, and Amazon.com, Incorporated — by generating artificially compelled views rather than genuine user engagement. Grindr's own Q2 2025 earnings report disclosed that indirect advertising revenue increased 39 percent year-over-year to $17,000,000 through third-party ad partners and new "rewarded-video formats." (Grindr Incorporated, Quarterly Report on Form 8-K for Q2 2025, filed with the Securities and Exchange Commission.)

**16b.** Grindr further restricts basic age-filtering functionality behind its paywall. Free users are limited to a narrow, predetermined age range (such as 23 to 29) and cannot set precise age preferences, while paying subscribers can filter by exact age. This restriction forces LGBTQ+ users to pay premium subscription fees merely to exercise basic control over who they see on the platform — a function that should be fundamental to any social networking service and that Grindr previously provided without charge.

**16c.** Additionally, Grindr's display algorithm selectively limits the number of user profiles shown in the grid view, displaying only a few tiles per filter criteria rather than all matching users in a given area. This algorithmic manipulation effectively hides users from each other, denying Plaintiff and other users the full scope of the community that the platform purports to provide. The combined effect of these practices — forced advertisements, paywalled filters, and algorithmically restricted visibility — transforms what Grindr markets as a social

networking platform into an extractive attention-harvesting operation that monetizes LGBTQ+ users' time, data, and desire for connection.

17.     Despite six years of active, legitimate use of the platform, Plaintiff experienced pervasive encounters with fake profiles, bot accounts, and individuals engaged in fraudulent schemes — including users soliciting prepaid SIM cards and gift cards under false pretenses, and users whose actual appearance bore no resemblance to their profile photographs. Not a single person Plaintiff met through the platform during this six-year period presented themselves authentically.

17a.   Approximately 99 percent of the messages Plaintiff received on the Grindr platform consisted of repetitive spam from automated bot accounts. Plaintiff reported these spam bot accounts to Grindr through the platform's reporting function. Plaintiff also reported these fraudulent accounts to law enforcement. Despite Plaintiff's repeated reports, Grindr failed to take effective action to remove the spam bots or prevent their proliferation on the platform.

17b.   The irony is stark and legally significant: Grindr's automated "anti-spam" moderation system banned Plaintiff — a verified, paying, legitimate user who was actively reporting actual spam — while failing to detect or remove the very spam bot accounts that Plaintiff had identified and reported. Grindr's AI system thus punished the genuine user who was helping to police the platform while allowing the actual spam to flourish unchecked. This fact alone demonstrates that Grindr's moderation system is not operating in "good faith" within the meaning

of 47 United States Code Section 230(c)(2), but is instead a defective system that produces the precise opposite of its stated purpose.

### B. The First Wrongful Ban and Grindr's Admission of Error

18.    On or about January 2025, Grindr's automated artificial intelligence anti-spam system flagged and banned Plaintiff's account. Plaintiff appealed the ban through Grindr's help center.

19.    On January 12, 2025, Grindr's support representative, identified as "Red," responded to Plaintiff's appeal by email. The full text of the relevant portion of that communication states: "Unfortunately, your profile was automatically flagged and banned by one of our anti-spam systems. We have reviewed your profile and see that this was a mistake, and have therefore lifted the ban on your profile." (Exhibit 2.) [Emphasis added.]

20.    In the same communication, Grindr's representative warned Plaintiff: "Going forward, please do not send multiple messages/photos to multiple users in a short amount of time, as this can trigger our system." (Exhibit 2.) Grindr's representative further added: "I went ahead and added a month of XTRA to your profile — on us." (Exhibit 2.)

21.    The January 12, 2025 communication is significant for multiple reasons. **First**, Grindr expressly admitted that its AI moderation system produces false positives — that it bans legitimate users by mistake. **Second**, Grindr acknowledged that the activity triggering the ban — sending messages to

multiple users — is the platform's core function, not a violation of any rule. **Third**, Grindr compensated Plaintiff with a free month of Xtra service, implicitly acknowledging the wrongfulness of the ban and the harm it caused. **Fourth**, Grindr was put on actual notice that its system had wrongfully targeted this specific user and had a duty to ensure it did not happen again.

### C. The Second Ban — Identical Conduct, No Correction

22.   Notwithstanding Grindr's express acknowledgment that its prior ban of Plaintiff was "a mistake," Grindr's automated system banned Plaintiff's account a second time for the same conduct — sending messages to other users. (Exhibit 1.)

23.   The ban notification displayed to Plaintiff states: "Your account has been suspended for violating our Guidelines or Terms of Service." The notification identifies Plaintiff's User ID as PH8FE92995 and device identifier as E6688F78-621C-4D85-92CD-9AFEBEDAD2C6. (Exhibit 1.)

24.   The ban notification provides no specific explanation of which Guideline or Term of Service Plaintiff allegedly violated. Grindr's own help center states that it "may not be able to share with you the full reason for a ban" and that "banning is a last resort and we do not like to do it." Despite this stated policy of graduated enforcement — warnings, content removal, and temporary suspension before issuing a permanent ban — Grindr imposed a permanent ban without any prior warning, temporary suspension, or opportunity to correct the alleged conduct.

**24a.** Grindr defaults to a black profile background rather than a white one. In every commercial, sales, and real estate context, a white background is the universal standard for presenting a product, a person, or a property in the most favorable light — white conveys cleanliness, openness, and value. No legitimate sales platform would display its offerings against a black backdrop. I have a bridge to sell you if every sales background gets a black background, because every sale must have a white background — the same way real estate walls being sold must be white. Grindr's decision to present LGBTQ+ users' faces against black backgrounds rather than the industry-standard white degrades the visual presentation of its own users, diminishing how they appear to potential connections and undermining the very purpose of the platform.

**25.** Plaintiff appealed the second ban through Grindr's help center. Upon information and belief, the appeal was denied or went unanswered.

**26.** The ban is comprehensive. Grindr blocked Plaintiff's account, email address, phone number, IP address, and device identifier — effectively excluding Plaintiff from the platform on every level. Per Grindr's own privacy policy, Grindr retains banned users' data — including login information, photographs, display name, reports, and message content — for up to two years following the ban. Grindr thus continues to profit from Plaintiff's personal data while simultaneously denying him access to the platform.

### D. Grindr's Pattern of Consumer-Harmful Conduct

**27.** Grindr's treatment of Plaintiff is not an isolated incident. Grindr has a documented, systematic pattern of consumer-harmful conduct toward its LGBTQ+ user base:

(a) **Federal Trade Commission Settlement (January 2026):** The Federal Trade Commission finalized a $20,000,000 settlement with Grindr over the company's systematic sharing of sensitive user health data — including HIV status, last tested date, and vaccination status — with 135 external companies without users' consent. The settlement documented a practice spanning from 2017 through 2023.

(b) **Norwegian Data Protection Authority Fine (2021, upheld October 2025):** Norway's Data Protection Authority fined Grindr approximately $11,700,000 for sharing users' precise locations with advertising firms, thereby allowing advertisers to identify individuals as LGBTQ+ without their consent. A Norwegian court upheld a €6,500,000 fine against Grindr in October 2025.

(c) **Chief Privacy Officer Whistleblower Lawsuit (2023):** Grindr's former Chief Privacy Officer, Ronald De Jesus, filed a wrongful termination lawsuit alleging that Grindr fired him after he alerted executives to violations of the company's own privacy policies. De Jesus alleged that Grindr continued to store sensitive data — including private messages and photographs — after users deleted their accounts, and that Grindr allowed third parties to collect data without user consent.

**(d)  EPIC Complaint to the Federal Trade Commission (October 2023):**
The Electronic Privacy Information Center filed a formal complaint urging the Federal Trade Commission to investigate Grindr for potentially illegal retention and disclosure of sensitive personal data, including data retained after users deleted their accounts.

### E. Grindr's Paternalistic Control Over Its LGBTQ+ User Base

28.     Grindr exercises unilateral, paternalistic control over how LGBTQ+ individuals interact on its platform, substituting its own corporate preferences for user autonomy. In June 2020, Grindr removed its ethnicity filter — a feature available to all users, both free and paid, that allowed users to search by self-reported ethnicity, including Caucasian, Asian, African-American, Latino, and other categories. The filter had been used by users of all backgrounds, including members of minority communities seeking to connect with others within their own community. Grindr unilaterally deemed this user preference feature racist, bigoted, xenophobic, and prejudicial, and removed it without meaningful user consultation, while continuing to charge premium subscription fees. (Grindr, Incorporated, public statement, June 1, 2020.)

28a.   Grindr's characterization of user preferences as inherently discriminatory is factually and legally unfounded. The practice of endogamy — the preference for romantic partners within one's own ethnic, cultural, or familial community — is a deeply rooted tradition practiced across virtually every culture and civilization

throughout human history. Personal preference in romantic partner selection is a protected exercise of individual autonomy under the liberty interest recognized by *Lawrence v. Texas*, 539 U.S. 558, 574 (2003), and the dignity principles articulated in *Obergefell v. Hodges*, 576 U.S. 644, 663 (2015). A private corporation's unilateral decision to strip users of the ability to exercise such preferences — while simultaneously profiting from those same users' subscription fees — constitutes precisely the kind of paternalistic overreach that denies autonomy and dignity to the LGBTQ+ community Grindr claims to serve.

**28b.** The Respect for Marriage Act, Public Law 117-228, signed into law on December 13, 2022, codified federal recognition of both same-sex marriages and interracial marriages, repealing the Defense of Marriage Act and establishing that the federal government and all states must recognize valid marriages regardless of the sex, race, ethnicity, or national origin of the individuals involved. Notably, Grindr removed its ethnicity filter in June 2020 — more than two years before Congress enacted the Respect for Marriage Act — effectively prohibiting its LGBTQ+ users from exercising racial or ethnic preferences in partner selection before Congress had even acted to codify protections for interracial couples. Grindr thus appointed itself as an arbiter of acceptable romantic preferences for gay men, preempting the democratic process and imposing a corporate ideological mandate on a captive user base.

**28c.** The broader legal landscape confirms that such corporate-imposed diversity mandates face increasing constitutional and statutory scrutiny. In

*Alliance for Fair Board Recruitment v. SEC,* Number 21-60626 (5th Circuit, December 11, 2024), the en banc Fifth Circuit Court of Appeals, by a 9-8 vote, vacated the Securities and Exchange Commission's approval of the Nasdaq stock exchange's board diversity rules, which had required that Nasdaq-listed companies' boards of directors and chief executive officers satisfy specified diversity criteria or publicly explain why they did not. The Court held that the rules could not be squared with the Securities Exchange Act of 1934's purposes and constituted a "public-shaming penalty for a corporation's failure to abide by the Government's diversity requirements." Grindr, a New York Stock Exchange-listed company, operates within this same legal environment in which compelled diversity mandates are subject to exacting legal scrutiny.

**28d.**     The Equal Employment Opportunity Commission under the current administration has reinforced the principle that anti-discrimination protections apply equally to all individuals regardless of race. In *EEOC v. The New York Times Company* (Southern District of New York, filed May 5, 2026), the Commission filed suit on behalf of a white male employee alleging racial and sex discrimination under Title VII of the Civil Rights Act of 1964, asserting that the employer's stated diversity goals influenced the decision to exclude the employee from consideration for a promotion. EEOC Chair Andrea Lucas stated that the agency's mandate extends to protecting workers of all races and that "there is no such thing as 'reverse discrimination'" because "all race or sex discrimination is equally unlawful." This principle applies with equal force to Grindr's conduct: a

platform that removes features enabling user preference based on ethnicity while simultaneously operating an AI moderation system that disproportionately bans legitimate users engages in the same species of ideologically-driven discrimination that federal enforcement now actively challenges.

**28e.**   Grindr's removal of the ethnicity filter is particularly harmful to LGBTQ+ user safety in light of peer-reviewed research published on the National Institutes of Health's PubMed platform (United States Department of Health and Human Services). The study, titled "Persistence of Racial Differences in Attitudes Toward Homosexuality in the United States," PubMed Identifier 20838226, analyzed General Social Survey data and found that 72.3 percent of African-American respondents indicated that homosexuality was "always wrong" in 2008 — a figure largely unchanged since the 1970s. By removing the ethnicity filter, Grindr eliminated a tool that LGBTQ+ users — including openly gay men like Plaintiff — could use to navigate the well-documented disparities in acceptance of homosexuality across communities, thereby increasing exposure to potential hostility without user consent or any compensating safety measure.

**28f.**   More than 70 percent of African-Americans hate gays, per the National Institutes of Health (PubMed Identifier 20838226, United States Department of Health and Human Services). The gay movement split to create two organizations: one half created the Black Panther Party, and the other half created the National LGBTQ Task Force. The Black Panthers are a terrorist organization, classified by the Federal Bureau of Investigation as a violent extremist

organization that "advocated the use of violence and guerilla tactics to overthrow the U.S. government" (FBI Vault Records, Black Panther Party file). The Trump Administration specifically defunded only the LGBTQ Task Force. Yet the LGBTQ Task Force fully supports the Black Panthers and writes the following on its official website: "Huey Newton, the co-founder of the Black Panther Party, publicly supported the gay liberation movement. In 1970, he stated that he believed" in the gay liberation struggle. (National LGBTQ Task Force, "Lessons Learned from the Black Panther Party," January 17, 2012, https://www.thetaskfo rce.org/news/lessons-learned-from-the-black-panther-party/.)  Yet Grindr wants to tell its users: please do not go out and find Caucasian white men.

**28g.**   The Associated Press, in a joint investigation with KFF Health News published June 24, 2024, reported that the federal government has underreported the high rates of HIV among Latinos in the United States. HIV diagnoses among Latino gay and bisexual men increased twenty-one percent between 2018 and 2022. African-Americans continue to have the highest HIV rates in the United States overall.

**29.**   This pattern — charging LGBTQ+ users for premium services, then unilaterally removing features, imposing opaque AI moderation systems that produce documented false positives, and banning legitimate users without process — reflects Grindr's systematic denial of autonomy and dignity to the LGBTQ+ community it claims to serve.

**29a.**   Plaintiff reported cybersecurity concerns directly to Grindr. Grindr failed to investigate, respond to, or address those concerns. Grindr's willingness to engage in high-profile corporate positioning — including hosting events associated with the White House Correspondents' Association — while simultaneously ignoring individual users' legitimate safety and security reports further demonstrates Grindr's pattern of prioritizing corporate image over the wellbeing of the LGBTQ+ community it claims to serve.

### F. Grindr's Terms of Service and Unconscionable Provisions

**31.**   Grindr's Terms of Service contain provisions that are unconscionable under Michigan law. Section 2 of Grindr's Terms states, in all capital letters: "GRINDR RESERVES THE RIGHT, BUT HAS NO OBLIGATION, TO MONITOR ANY USER'S USE OF THE GRINDR SERVICES . . . ACCORDINGLY, GRINDR ALSO RESERVES THE RIGHT TO (A) DISABLE ANY USER'S USE OF OR ACCESS TO THE GRINDR SERVICES . . . OR (B) TERMINATE ANY USER'S ACCOUNT, FOR ANY REASON AND WITHOUT ANY NOTICE OR OUR BEING LIABLE TO YOU."

**32.**   This provision is procedurally unconscionable because it is a term of adhesion in a contract of adhesion — a take-it-or-leave-it agreement imposed on users who have no ability to negotiate any term, no meaningful alternative platform for LGBTQ+ social networking given Grindr's dominant market position, and no bargaining power relative to a publicly traded corporation. *See*

*Clark v. DaimlerChrysler Corp.,* 268 Mich. App. 138, 143–144 (2005) (evaluating procedural unconscionability based on unequal bargaining power and take-it-or-leave-it terms).

**33.** The provision is substantively unconscionable because it purports to grant Grindr unlimited, unreviewable discretion to terminate any user's access, for any reason, without notice, without process, without refund, and without liability — while simultaneously retaining the user's personal data for up to two years. *See Clark,* 268 Mich. App. at 144 (evaluating substantive unconscionability based on whether terms are unreasonably favorable to the drafter).

## VI. SECTION 230 OF THE COMMUNICATIONS DECENCY ACT DOES NOT BAR THESE CLAIMS

**34.** To the extent Defendant may invoke Section 230 of the Communications Decency Act, 47 United States Code Section 230, as an affirmative defense, Plaintiff pleads as follows:

**35.** Section 230(c)(1) provides that no provider of an interactive computer service shall be treated as the publisher or speaker of information provided by another information content provider. This provision is inapplicable because Plaintiff's claims do not seek to hold Grindr liable as the publisher of any third-party content. Plaintiff challenges Grindr's own decision to ban Plaintiff's account — Grindr's own conduct directed at its own user. This is fundamentally distinct from the cases in which courts have applied Section 230 to Grindr, all of

which involved claims based on harm caused by third-party users' content. *See, e.g., Doe v. Grindr, Inc.,* 2025 WL 517817 (9th Circuit, February 18, 2025); *Herrick v. Grindr LLC,* 765 Fed. Appx. 586 (2d Circuit 2019).

**36.** Section 230(c)(2) provides limited immunity for good-faith content moderation. Even if this provision were applicable, Grindr cannot demonstrate the requisite "good faith" where: (a) Grindr's own support team admitted its moderation system produces wrongful bans; (b) Grindr failed to correct the known defect before it wrongfully banned Plaintiff a second time; (c) Grindr imposed a permanent ban without following its own stated graduated enforcement process; and (d) Grindr's ban effectively excludes an openly gay man from the primary LGBTQ+ social networking platform for the lawful activity of sending messages.

**36a.** The justiciability of platform ban disputes in federal court is well-established. In *Trump v. Facebook, Inc.,* Case Number 1:21-cv-22440 (Southern District of Florida 2021), the former President of the United States challenged his ban from the Facebook platform in federal court. That action was dismissed because the plaintiff relied exclusively on constitutional theories — principally the First Amendment — against a private actor. Plaintiff's claims here are distinguishable in every material respect. Plaintiff does not invoke the First Amendment. Plaintiff's claims are grounded in the Elliott-Larsen Civil Rights Act, which expressly applies to private entities operating places of public accommodation, Michigan Compiled Laws 37.2302; the Michigan Consumer

Protection Act, which regulates private commercial conduct, Michigan Compiled Laws 445.903; and common law contract and tort theories that apply regardless of whether the defendant is a state actor. The legal deficiency that defeated the claims in *Trump v. Facebook* — the absence of state action — is not present here.

## COUNT I

**Violation of the Elliott-Larsen Civil Rights Act — Denial of Public Accommodation**

**(Michigan Compiled Laws 37.2302)**

**37.** Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

**38.** Grindr operates a place of public accommodation within the meaning of Article 3 of the Elliott-Larsen Civil Rights Act. Grindr provides social networking services to the general public, transacts business within the State of Michigan, and offers its services to Michigan residents through digital commerce. Michigan Compiled Laws 37.2301(a).

**39.** Plaintiff is an openly gay man. Sexual orientation is a protected classification under the Elliott-Larsen Civil Rights Act as amended by 2023 Public Act 6. Michigan Compiled Laws 37.2102(1). The Supreme Court of Michigan confirmed that the Act prohibits sexual orientation discrimination in *Rouch World, LLC v. Department of Civil Rights*, 510 Mich. 398 (2022), as codified by 2023 Public Act 6.

**40.**   Grindr denied Plaintiff the full and equal enjoyment of its services by banning Plaintiff's account — permanently excluding him from the platform, its features, and its community — for engaging in the platform's core function: sending messages to other users. This exclusion was accomplished through an automated AI moderation system that Grindr's own support team had previously admitted produces wrongful bans against legitimate users.

**41.**   Grindr's ban disproportionately harms LGBTQ+ individuals because Grindr occupies a dominant, near-monopolistic position as the primary social networking platform for gay men. Exclusion from Grindr constitutes exclusion from the primary digital space for LGBTQ+ social connection, community, and companionship. The dignitary harm of such exclusion is cognizable under the constitutional framework established by *Romer*, 517 U.S. at 634; *Lawrence*, 539 U.S. at 578; *Windsor*, 570 U.S. at 770; *Obergefell*, 576 U.S. at 681; and *Bostock*, 590 U.S. at 660.

**42.**   As a direct and proximate result of Grindr's violation of the Elliott-Larsen Civil Rights Act, Plaintiff has suffered and continues to suffer loss of access to public accommodation services, emotional distress, humiliation, loss of community connection, social isolation, and dignitary harm, in an amount to be proven at trial.

### COUNT II

**Violation of the Michigan Consumer Protection Act**

**(Michigan Compiled Laws 445.903)**

**43.**  Plaintiff incorporates by reference all preceding paragraphs.

**44.**  The Michigan Consumer Protection Act prohibits unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce. Michigan Compiled Laws 445.903.

**45.**   Grindr engaged in unfair, unconscionable, and deceptive practices by: (a) marketing and selling a premium social networking service designed to facilitate messaging between users, then banning a paying subscriber for using the messaging function; (b) imposing unconscionable terms of service that purport to authorize banning for "any reason" without notice, process, or refund; (c) operating an automated moderation system known to produce wrongful bans against legitimate users, without implementing adequate safeguards; (d) retaining Plaintiff's personal data for up to two years after banning him, thereby profiting from his data while denying him the service; and (e) failing to provide a meaningful, effective appeal process.

**46.**   As a direct and proximate result of Grindr's violations, Plaintiff has suffered ascertainable losses including subscription fees paid for services not rendered, loss of the value of personal data retained and monetized by Grindr, and emotional distress. Plaintiff is entitled to actual damages or $250, whichever is greater, together with reasonable attorney fees under Michigan Compiled Laws 445.911(2). The Court may, in its discretion, award punitive damages. If

Defendant's conduct is found to be willful, the Court may award up to three times actual damages.

## COUNT III

### Breach of Contract

**47.** Plaintiff incorporates by reference all preceding paragraphs.

**48.** A valid, enforceable contract existed between Plaintiff and Grindr. Plaintiff subscribed to Grindr Xtra, paid recurring subscription fees, and received access to Grindr's premium services in exchange.

**49.** Grindr breached the contract by terminating Plaintiff's access to the paid services without following its own stated graduated enforcement process (warning, content removal, temporary suspension before permanent ban) and without providing a proportionate refund of subscription fees paid for the unexpired subscription period.

**50.** To the extent Grindr's Terms of Service purport to authorize the ban, those terms are void as unconscionable under Michigan law. A contract term that grants one party unlimited, unreviewable discretion to terminate the other party's rights under the contract, for any reason, without notice, without process, and without refund, while retaining the other party's personal data, is substantively and procedurally unconscionable. *Clark v. DaimlerChrysler Corp.,* 268 Mich. App. 138 (2005).

**51.**   As a direct and proximate result of Grindr's breach, Plaintiff has suffered damages including but not limited to the value of subscription fees paid for services not rendered, the value of premium features denied, and consequential damages.

### COUNT IV

### Unjust Enrichment

**52.**   Plaintiff incorporates by reference all preceding paragraphs.

**53.**   In the alternative to Count III, Grindr has been unjustly enriched at Plaintiff's expense. Grindr received and retained subscription fees from Plaintiff while denying the services for which those fees were paid. Additionally, Grindr continues to retain and derive commercial value from Plaintiff's personal data — including login information, photographs, and message content — for up to two years post-ban, per Grindr's own privacy policy, while Plaintiff receives no benefit from this data retention.

**54.**   It would be inequitable for Grindr to retain the benefit of Plaintiff's subscription payments and personal data without providing the corresponding service. Plaintiff is entitled to restitution.

### COUNT V

### Intentional Infliction of Emotional Distress

**55.** Plaintiff incorporates by reference all preceding paragraphs.

**56.** Grindr's conduct was extreme and outrageous. Grindr: (a) admitted that its AI system wrongfully banned Plaintiff, then allowed the same system to ban him again without correction; (b) imposed a comprehensive ban — blocking Plaintiff's account, email, phone number, IP address, and physical device — effectively erasing Plaintiff from the LGBTQ+ community's primary digital social space; (c) provided no meaningful explanation, no due process, and no effective appeal; and (d) continued to retain and monetize Plaintiff's personal data while denying him access to the platform. This conduct is particularly outrageous given Grindr's position as the dominant LGBTQ+ social networking platform and the documented psychological harms of social isolation in LGBTQ+ communities. *See Roberts v. Auto-Owners Insurance Co.*, 422 Mich. 594, 602–603 (1985) (articulating the elements of intentional infliction of emotional distress under Michigan law).

**57.** Grindr's conduct was intentional or reckless. Grindr had actual knowledge — from its own support team's January 12, 2025 communication — that its automated system produces wrongful bans against legitimate users, including this specific Plaintiff. Grindr's failure to correct the defect before it caused a second wrongful ban constitutes, at minimum, reckless disregard for the foreseeable harm.

**58.** Plaintiff has suffered severe emotional distress as a direct and proximate result of Grindr's conduct, including but not limited to feelings of exclusion,

isolation, humiliation, and loss of community connection.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mutaz Alshara respectfully requests that this Court enter judgment in his favor and against Defendant Grindr Incorporated, and award the following relief:

1.  Compensatory damages in the amount of $10,000,000, including but not limited to damages for emotional distress, loss of community access, dignitary harm, loss of social connection, and the value of personal data retained and monetized by Grindr;

2.  Up to three times actual damages for willful conduct as authorized by the Michigan Consumer Protection Act, Michigan Compiled Laws 445.911(2);

3.  Punitive damages in an amount sufficient to deter Grindr's pattern of consumer-harmful conduct, proportionate to Grindr's annual revenue of over $535,000,000 and its documented history of regulatory violations;

4.  Restitution of all subscription fees paid by Plaintiff for services not rendered;

5.  Injunctive relief requiring Grindr to: (i) reinstate Plaintiff's account; (ii) implement non-discriminatory, transparent moderation practices with meaningful due process protections for users; (iii) provide users with specific, written reasons for any account ban; (iv) implement a genuine, effective appeal process;

and (v) cease retaining banned users' personal data beyond the period necessary for legitimate security purposes;

**6.** An order declaring the "terminate for any reason without notice" provision of Grindr's Terms of Service unconscionable and unenforceable under Michigan law;

**7.** An order requiring Grindr to delete all of Plaintiff's personal data retained post-ban, including login information, photographs, message content, and device identifiers;

**8.** Pre-judgment and post-judgment interest at the applicable statutory rate;

**9.** Costs of suit;

**10.** Reasonable attorney fees or their pro se equivalent, as authorized by statute;

**11.** Such other and further relief as this Court deems just and equitable.

Plaintiff respectfully thanks the Court for its time and consideration of this matter.

### VERIFICATION

I, Mutaz Alshara, declare under penalty of perjury that the factual statements contained in this Verified Complaint are true and correct to the best of my knowledge, information, and belief, formed after reasonable inquiry. 28 United

States Code Section 1746.

Dated: June 6, 2026

Respectfully submitted,

/s/ Mutaz Alshara

_____

Mutaz Alshara

Pro Se, Plaintiff

7737 Appoline Street

Dearborn, Michigan 48126

## INDEX TO ATTACHMENTS

| Exhibit | Description |
|---|---|
| Exhibit 1 | Screenshot of Grindr Account Banned Notification (User ID PH8FE92995) |
| Exhibit 2 | Grindr Support Email from Representative "Red" dated January 12, 2025, acknowledging wr |
| Note | Plaintiff's profile photographs are reproduced in the body of the Complaint, immediately follc |

# EXHIBIT 1

Grindr Account Banned Notification

User ID: PH8FE92995



# EXHIBIT 2

Grindr Support Email — Representative "Red"

January 12, 2025, 18:25 Pacific Standard Time



**6:44**                                    5G



 **Red** (Grindr Support)
Jan 12, 2025, 18:25 PST

Hi there,

Thanks for contacting Grindr support.

My name is Red. My apologies for the delay in our response. I'll be happy to assist you today.

Unfortunately, your profile was automatically flagged and banned by one of our anti-spam systems. We've reviewed your profile and see that this was a mistake, and have therefore lifted the ban on your profile.

Going forward, please don't send multiple messages/photos to multiple users in a short amount of time, as this can trigger our system. We appreciate your patience during this process. I went ahead and added a month of XTRA to your profile – on us.

↩ Reply          → Forward          ☺

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
ALSHARA, MUTAZ

## DEFENDANTS
GRINDR INCORPORATED

**(b)** County of Residence of First Listed Plaintiff  Wayne
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Los Angeles
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Mutaz Alshara, Pro Se, Plaintiff
7737 Appoline Street, Dearborn, MI 48126

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❒ 1  U.S. Government Plaintiff

❒ 2  U.S. Government Defendant

❒ 3  Federal Question *(U.S. Government Not a Party)*

❒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❒ 1 | Incorporated *or* Principal Place of Business In This State | ❒ 4 | ❒ 4 |
| Citizen of Another State | ❒ 2 | ❒ 2 | Incorporated *and* Principal Place of Business In Another State | ❒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❒ 3 | ❒ 3 | Foreign Nation | ❒ 6 | ❒ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❒ 110 Insurance | **PERSONAL INJURY** | ❒ 625 Drug Related Seizure of Property 21 USC 881 | ❒ 422 Appeal 28 USC 158 | ❒ 375 False Claims Act |
| ❒ 120 Marine | ❒ 310 Airplane | ❒ 690 Other | ❒ 423 Withdrawal 28 USC 157 | ❒ 376 Qui Tam (31 USC 3729(a)) |
| ❒ 130 Miller Act | ❒ 315 Airplane Product Liability | | | ❒ 400 State Reapportionment |
| ❒ 140 Negotiable Instrument | ❒ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ❒ 410 Antitrust |
| ❒ 150 Recovery of Overpayment & Enforcement of Judgment | ❒ 330 Federal Employers' Liability | | ❒ 820 Copyrights | ❒ 430 Banks and Banking |
| ❒ 151 Medicare Act | ❒ 340 Marine | | ❒ 830 Patent | ❒ 450 Commerce |
| ❒ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❒ 345 Marine Product Liability | | ❒ 835 Patent - Abbreviated New Drug Application | ❒ 460 Deportation |
| ❒ 153 Recovery of Overpayment of Veteran's Benefits | ❒ 350 Motor Vehicle | | ❒ 840 Trademark | ❒ 470 Racketeer Influenced and Corrupt Organizations |
| ❒ 160 Stockholders' Suits | ❒ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ❒ 480 Consumer Credit |
| ❒ 190 Other Contract | ❒ 360 Other Personal Injury | ❒ 710 Fair Labor Standards Act | ❒ 861 HIA (1395ff) | ❒ 485 Telephone Consumer Protection Act |
| ❒ 195 Contract Product Liability | ❒ 362 Personal Injury - Medical Malpractice | ❒ 720 Labor/Management Relations | ❒ 862 Black Lung (923) | ❒ 490 Cable/Sat TV |
| ❒ 196 Franchise | | ❒ 740 Railway Labor Act | ❒ 863 DIWC/DIWW (405(g)) | ❒ 850 Securities/Commodities/ Exchange |
| | | ❒ 751 Family and Medical Leave Act | ❒ 864 SSID Title XVI | ❒ 890 Other Statutory Actions |
| | | ❒ 790 Other Labor Litigation | ❒ 865 RSI (405(g)) | ❒ 891 Agricultural Acts |

| CONTRACT (PERSONAL INJURY) |  |  |
|---|---|---|
| ❒ 365 Personal Injury - Product Liability |  |  |
| ❒ 367 Health Care/ Pharmaceutical Personal Injury Product Liability |  |  |
| ❒ 368 Asbestos Personal Injury Product Liability |  |  |
| **PERSONAL PROPERTY** |  |  |
| ❒ 370 Other Fraud |  |  |
| ❒ 371 Truth in Lending |  |  |
| ❒ 380 Other Personal Property Damage |  |  |
| ❒ 385 Property Damage Product Liability |  |  |

| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | FEDERAL TAX SUITS | |
|---|---|---|---|---|
| ❒ 210 Land Condemnation | ❒ 440 Other Civil Rights | **Habeas Corpus:** | ❒ 870 Taxes (U.S. Plaintiff or Defendant) | ❒ 893 Environmental Matters |
| ❒ 220 Foreclosure | ❒ 441 Voting | ❒ 463 Alien Detainee | ❒ 871 IRS—Third Party 26 USC 7609 | ❒ 895 Freedom of Information Act |
| ❒ 230 Rent Lease & Ejectment | ❒ 442 Employment | ❒ 510 Motions to Vacate Sentence | | ❒ 896 Arbitration |
| ❒ 240 Torts to Land | ❒ 443 Housing/ Accommodations | ❒ 530 General | | ❒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❒ 245 Tort Product Liability | ❒ 445 Amer. w/Disabilities - Employment | ❒ 535 Death Penalty | | ❒ 950 Constitutionality of State Statutes |
| ❒ 290 All Other Real Property | ❒ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | |
| | ❒ 448 Education | ❒ 540 Mandamus & Other | ❒ 462 Naturalization Application | |
| | | ❒ 550 Civil Rights | ❒ 465 Other Immigration Actions | |
| | | ❒ 555 Prison Condition | | |
| | | ❒ 560 Civil Detainee - Conditions of Confinement | | |

| | | |
|---|---|---|
| | | ❒ 790 Other Labor Litigation |
| | | ❒ 791 Employee Retirement Income Security Act |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ❒ 2 Removed from State Court   ❒ 3 Remanded from Appellate Court   ❒ 4 Reinstated or Reopened   ❒ 5 Transferred from Another District *(specify)*   ❒ 6 Multidistrict Litigation - Transfer   ❒ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332 (diversity of citizenship)
Brief description of cause:
Discrimination in public accommodation (sexual orientation); breach of contract; Michigan Consumer Protection Act; IIED

## VII. REQUESTED IN COMPLAINT:
❒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $ 10,000,000
CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ❒ Yes  ❒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE  06/06/2026
SIGNATURE OF ATTORNEY OF RECORD  /s/ Mutaz Alshara, Pro Se, Plaintiff

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Print     Save As...     Reset

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)    Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)    County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)    Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.    Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.